Opinion
 

 THE COURT.
 
 *
 

 In proceedings in juvenile court, Jorge S. was found to be a minor violating laws defining crime (Welf. & Inst. Code, § 602) in that he had committed a burglary. The court declared the offense to be a misdemeanor, declared appellant a ward of the court and placed him on probation in the home of his mother. He appeals contending: “The order adjudging appellant to be a ward of the juvenile court must be reversed as appellant’s confession was obtained by the police as the result of an illegal arrest, and should have been suppressed.”
 

 The undisputed facts developed in the court below establish that at approximately 11 a.m. on December 13, 1976, a school day, Los Angeles Police Officer Antonio Diaz was on patrol in his marked police unit. He testified that at that time “I saw a male Latin [Jorge S.], standing on what appeared to be the front porch of a house on the south side of the street across from a pedestrian tunnel . . . [that ran] [ujndemeath a freeway.”
 

 
 *855
 
 Officer Diaz further testified that as he drove by appellant at approximately two miles per hour appellant “kept looking towards—in my direction several times, and he appeared to be knocking on a door, making like he was knocking on a door, but it appeared his hand was not making contact with the door.” Directly across the street from appellant another juvenile “was standing in front of the tunnel where this heavy pedestrian traffic, older people or persons traveled through. He was standing directly in front of the tunnel, and as I drove by, he also kept looking in my direction, back and forth to see where I was going.” As the officer continued beyond the two men he saw appellant “cross the street and join with [the other youth] in front of the tunnel.”
 

 Officer Diaz had personally taken a report from a Mrs. Wu who, on December 2, 1976, had been robbed in this same tunnel by an assailant whom she described as a “male Latin, dark hair, five foot eight, maybe 150 pounds, and in his early twenties.” The record shows that on October 12, 1976, appellant was 17. It does not show his hair color, height or weight but appellant’s counsel stated without contradiction that “the minor has medium brown to light brown hair, and he weighs much closer to 120 pounds than 150. .. . and he certainly doesn’t look like he’s in his twenties.” In addition, Diaz testified that the population in the area was largely Latin and Oriental.
 

 Officer Diaz also testified that at that time there was in effect an “operation—a stay in school type program. We have two people from the school authorities at the Hollywood Station, and any individual found on the streets after nine o’clock that is supposed to be in school is transported to them by the officer, and they contact the school and the parents to let them know there is a truancy.” Appellant and his companion had first caught the officer’s attention because “it was 11 o’clock and these individuals appeared to be juveniles. They’re supposed to be in school.”
 

 In view of the foregoing facts, Officer Diaz determined to and did take “both subjects into custody.” The two juveniles were handcuffed together and immediately placed in the police vehicle. Then Diaz asked both juveniles why they weren’t in school. He received no reply from appellant; the other juvenile stated that he didn’t have 25 cents for lunch. Enroute to the Hollywood police station, Diaz informed appellant, “You’re being brought in for investigation of purse snatch”; the conversation in this respect was initiated by Diaz. Appellant’s response
 
 *856
 
 to this advice was that “[h]e just started trembling and shaking in the back of the vehicle.”
 

 At the Hollywood station, appellant was interviewed by another officer in Diaz’ presence. After having been fully advised of, and waiving, his constitutional rights as required by
 
 Miranda
 
 v. Arizona, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], appellant admitted the fact that he had burglarized the residence of one of his Oriental neighbors.
 

 No steps were taken at any time to deliver appellant to the school authorities at the Hollywood station. In fact they were located at the old Hollywood station and he was taken- to the new one, approximately one block distance therefrom.
 

 At the adjudication hearing appellant objected to the admissibility of his confession of burglary on the basis that it was obtained by exploitation of an unlawful arrest without probable cause. This objection was overruled and the confession was received in evidence. Additional evidence relating to the burglary was the testimony of the victim to the effect that signs of forced entry were found by him.
 

 We are constrained to agree with appellant’s claim that he was arrested without probable cause, that his confession was obtained by exploitation of that arrest and should, therefore, have been suppressed.
 

 The testimony of Officer Diaz makes it clear that appellant was arrested. He was taken into “custody,” handcuffed to his juvenile companion and informed that the reason for this action was that “he fit the description of the robbery suspect,” and he was transported to the police station. Under special circumstances, such an intrusive interference with appellant’s “right of liberty and personal freedom”
 
 (People
 
 v.
 
 Harris,
 
 15 Cal.3d 384, 390 [124 Cal.Rptr. 536, 540 P.2d 632]) might be sanctioned as an incident to prearrest detention. However, as our Supreme Court said in
 
 Harris
 
 (quoting
 
 People
 
 v.
 
 Courtney,
 
 11 Cal.App.3d 1185, 1192 [90 Cal.Rptr. 370]): “ ‘We recognize that it is only in a rare case where, absent probable cause for arrest, the removal of a suspect to a police station for further investigation is constitutionally permissible.’ ” (15 Cal.3d at p. 391.) There were, however, in this case no special circumstances such as those present in
 
 Courtney
 
 and referred to in
 
 Harris
 
 which justified the prearrest transportation to the police station. There was no menacing mob threatening the officer, no victims
 
 *857
 
 present at the station, and no prospect that by transporting appellant a few blocks to a crime scene his early release, rather than unduly prolonged field detention, might result.
 

 The People’s contention that the need for probable cause to arrest appellant on criminal charges may be dispensed with because of his apparent status as a truant juvenile, based upon Education Code section 12405, cannot be sustained. It is true that section 12405 authorizes arrest “during school hours, of any minor subject to compulsory full-time education or to compulsory continuation education found away from his home and who is absent from school without valid excuse . . . .” The “arrest” thereby authorized, however, is specifically limited by section 12406 which specifies that the arresting officer “shall forthwith deliver the minor” so arrested to his “parent, guardian, or other person having control” or to the school authorities, unless the minor has been declared to be “an habitual truant,” in which case he is to be “brought before the probation officer of the county. . . .” As limited by section 12406, it is clear that section 12405 does not authorize the arrest of apparently truant juveniles for the purpose of transporting them to the police station to be interrogated about all unsolved crimes of which they might be guilty. If Officer Diaz were acting under these Education Code sections, he would have been obliged to take appellant “forthwith” to the school authorities. The evidence was uncontradicted that appellant was taken to a place where there were no school authorities and interrogated as a suspect in an unsolved robbery case, The propriety of appellant’s arrest must, therefore, be tested on the basis of the existence of probable cause to arrest him for a crime.
 

 The above recited circumstances known to Officer Diaz did not establish probable cause to arrest him for any crime. “ ‘Cause for arrest exists when the facts known to the arresting officer “would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.” [Citations.]’
 
 (People
 
 v.
 
 Harris
 
 (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].)”
 
 (People
 
 v.
 
 DeVaughn,
 
 18 Cal.3d 889, 895 [135 Cal.Rptr. 786, 558 P.2d 872].) The arresting officer in this case did not know facts meeting this standard. The crime of which he allegedly suspected appellant had been committed 11 days previously; the place was one frequented by the general public. The description of the robbery suspect was so general that even if appellant’s appearance closely matched it, his presence in the vicinity 11 days after the crime (especially in a neighborhood with a large Latin population) created no reasonable
 
 *858
 
 inference of guilt. Moreover, one of the elements of the description was not matched by the defendant’s appearance. Officer Diaz testified that he initially took notice of appellant as a juvenile who was “supposed to be in school.” The description of the assailant had him “in his early twenties.” Though the conduct of appellant in apparently simulating knocking on the door of a residence might have been deemed suspicious had it been established that he did not reside there, Officer Diaz had no information indicating that he did not. Certainly, the fact that appellant and his juvenile companion watched the police cars that passed was not sufficient to make appellant a robbery suspect. We, therefore, conclude that the arrest of appellant was illegal.
 

 Inasmuch as the arrest was illegal, the admissibility of the confession depends upon whether the prosecution has sustained the burden of showing admissibility despite the illegality. The standard applicable to this determination was most recently stated by our Supreme Court in
 
 People
 
 v.
 
 De Vaughn, supra,
 
 18 Cal.3d at page 898. In
 
 DeVaughn,
 
 the court explained the effect of the decisions of the United States Supreme Court in
 
 Brown
 
 v.
 
 Illinois
 
 (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254] and
 
 Wong Sun
 
 v.
 
 United States
 
 (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407]. It said in this respect (18 Cal.3d at pp. 897-899):
 

 “In
 
 Brown
 
 v.
 
 Illinois, supra,
 
 422 U.S. 590, the accused after being arrested without probable cause and receiving the admonitions required by
 
 Miranda
 
 v.
 
 Arizona, supra,
 
 384 U.S. 436 made a confession. The United States Supreme Court, construing its holdings in
 
 Wong Sun
 
 v.
 
 United States, supra,
 
 371 U.S. 471, reasoned that the extrajudicial statements, unless demonstrated by the prosecution to be otherwise, were the product of an illegal invasion and that exclusion of the statements was necessary in order to protect Fourth Amendment guarantees in two respects: deterrence of lawless conduct by law enforcement officers, and preservation of judicial integrity.
 
 (Brown
 
 v.
 
 Illinois, supra,
 
 422 U.S. 590, 599-600 [45 L.Ed.2d 416, 424-425].) The court did not, however, foreclose to the state an opportunity to demonstrate that a particular statement was not in fact a product of the illegality. Thus in
 
 Wong Sun
 
 a statement was held inadmissible because it had been elicited from a defendant contemporaneously with an unlawful arrest, but a statement taken from a second defendant, also unlawfully arrested, was held to be admissible because that defendant had voluntarily returned several days after his arraignment and release to confess his involvement in the criminal conduct for which he had been arrested. The court thus stated in
 
 Brown
 
 
 *859
 
 that it had held in
 
 Wong Sun
 
 that ‘the connection between his unlawful arrest and the statement “had ‘become so attenuated as to dissipate the taint.’ (Citation.)” ’
 
 (Id,
 
 at pp. 598-599 [45 L.Ed.2d at p. 424].)
 
 [7]
 

 “When, as is claimed by the People in the instant case,
 
 Miranda
 
 admonitions are given to a suspect between the time of an arrest claimed by him to be without probable cause and the time of a subsequent extrajudicial statement of an incriminating nature, constitutional requirements for admission of the statement are not necessarily fully satisfied.
 
 Miranda
 
 warnings are intended to protect Fifth Amendment rights against ‘the compulsion inherent in custodial surroundings.’
 
 (Miranda
 
 v.
 
 Arizona, supra,
 
 384 U.S. 436, 458 [16 L.Ed.2d 694, 714].) Although the Fourth and Fifth Amendments are said to share an intimate relationship
 
 (Boyd v. United States
 
 (1886) 116 U.S. 616 [29 L.Ed. 746, 6 S.Ct. 524], a
 
 Miranda
 
 warning after an invasion in violation of the Fourth Amendment proscriptions does not necessarily remedy the unlawful violation or immunize the fruit which may thereafter become the product of that illegality for the reason that the Fourth Amendment serves interests and policies apart from those served by the Fifth Amendment and
 
 Miranda
 
 admonitions. In
 
 Brown
 
 the court declared: ‘. .. even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken,
 
 Wong Sun
 
 requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be “sufficiently an act of free will to purge the primary taint” [Citation].’
 
 (Brown
 
 v.
 
 Illinois, supra,
 
 422 U.S. 590, 601-602 [45 L.Ed.2d 416, 425-426].)
 

 “The court concluded that ‘the question whether a confession is the product of a free will under
 
 Wong Sun
 
 must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind
 
 *860
 
 are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The
 
 Miranda
 
 warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevant. [Citation.] The voluntariness of the statement is a threshold requirement. [Citation.] And the burden of showing admissibility rests, of course, on the prosecution.’
 
 (Id.,
 
 at pp. 603-604 [45 L.Ed.2d at p. 427].)
 
 [8]
 
 ”
 

 The court went on to hold that the facts in
 
 De Vaughn
 
 did not show that the initial confession made at the time and place of the defendant’s arrest “was not obtained by exploitation of his illegal arrest.”
 
 (Id.
 
 at p. 899.) It observed in this connection that it occurred “[w]ithin minutes of that arrest”
 
 (id.
 
 at pp. 899-900) upon the suspect being told that he “was to be taken ‘to jail for burglary and investigation down at the station’ ”
 
 (id.
 
 at p. 900). On this basis, it was held that there was no “intervening independent act of a free will, or other circumstance which could have served to attenuate the taint of the unconstitutional arrest and motivate the confessions.”
 
 (Ibid.)
 

 We have a virtually undistinguishable situation. Though appellant’s confession did not occur until he had reached the station, there is no showing that any substantial lapse of time occurred. Appellant was simply taken to the station and interrogation commenced. It appears, therefore, that there was “temporal proximity of the arrest and the confession” and that there were no “intervening circumstances.” It is, moreover, apparent that the purpose of the official misconduct was directed toward obtaining an admission of criminal conduct. Nor does it appear that it was any less flagrant than that involved in
 
 De Vaughn.
 
 In
 
 *861
 

 De Vaughn,
 
 the officers threatened to take the suspect to the police station without probable cause. In the case at bench, the officer carried out that threat. We must, therefore, conclude that appellant’s confession should have been suppressed. A reversal is, therefore, required.
 
 (People
 
 v.
 
 Powell,
 
 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137].)
 

 The judgment is reversed.
 

 *
 

 Before Cobey, Acting P. J., Allport, J., and Potter, J.
 

 [7]
 

 "In
 
 Wong Sun
 
 the court had explained its rationale in the following language: ‘We need not hold that all evidence is “fruit of the poisonous tree” simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” [Citation.]’
 
 (Wong Sun
 
 v.
 
 United States, supra,
 
 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456].) It also declared that the extrajudicial statement which it held to be inadmissible did not result from ‘ “an intervening independent act of a free will” ’
 
 (id,
 
 at p. 486 [9 L.Ed .2d at p. 454]) as, apparently, was true in the case of the statement which it held to be admissible. (See also
 
 People
 
 v.
 
 Bilderbach
 
 (1965) 62 Cal.2d 757, 767-768 [44 Cal.Rptr. 313,401 P.2d 921].)”
 

 [8]
 

 In
 
 People
 
 v.
 
 Johnson
 
 (1969) 70 Cal.2d 541 [75 Cal.Rptr. 401. 450 P.2d 865, 43 A.L.R.3d 366] we distinguished between a confession following an unlawful arrest as in the instant case and a confession following a confrontation of the defendant with illegally seized physical evidence.
 
 (Id.,
 
 at p. 552.) Subsequently,
 
 Johnson
 
 has been cited as authority for the proposition that ‘the real thrust of the inquiry [into the admissibility of a confession following an illegal arrest] is voluntariness.’
 
 (People
 
 v.
 
 Dominguez
 
 (1971) 21 Cal.App.3d 881, 885 [99 Cal.Rptr. 42], italics in original; see also
 
 People
 
 v.
 
 Magana
 
 (1969) 272 Cal.App.2d 388, 390 [77 Cal.Rptr. 436].) In light of our instant holdings as compelled by
 
 Brown
 
 we disapprove
 
 Dominguez
 
 and
 
 Magana
 
 and implications which may be inferred from language in
 
 Johnson
 
 insofar as there is any conflict with the views expressed herein.”